```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                          21-CR-397(CBA)
 3   UNITED STATES OF AMERICA,
                                          United States Courthouse
 4            Plaintiff,                  Brooklyn, New York

 5            -against-                   August 5, 2022
                                          9:00 a.m.
 6   JASMINDER SINGH,

 7            Defendant.
     --------------------------------x

 8
              TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
 9             BEFORE THE HONORABLE CAROL B. AMON
                UNITED STATES SENIOR DISTRICT JUDGE

10

11   APPEARANCES

12   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
13                              271 Cadman Plaza East
                                Brooklyn, New York 11201
14                              BY:  MICHAEL GIBALDI, AUSA
                                     PATRICK J. CAMPBELL, AUSA

15

16   For the Defendant:        MEISTER SEELIG & FEIN LLP
                                125 Park Avenue, 7th Floor
17                              New York, New York 10017
                                BY:  ILANA HARAMATI, ESQ.

18

19

20   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
21                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com

22

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

PROCEEDINGS

1              (In open court.)

2              THE COURTROOM DEPUTY:  All rise.

3              This is criminal cause for a sentencing.  Docket

4     number 21-CR-397.  U.S.A. versus Jasminder Singh.

5              Counsel, please state your appearances, starting

6     with the government and probation.

7              MR. GIBALDI:  Good morning, your Honor.  For the

8     United States, Michael Gibaldi.  With me at counsel table is

9     my colleague, Patrick J. Campbell.  Also with us at counsel

10    table is Special Agent Melody Shen from the FBI, and probation

11    Officer Erica Vest.

12             THE COURT:  Good morning.

13             MS. HARAMATI:  Good morning, your Honor.  Ilana

14    Haramati on behalf of Jasminder Singh, who is standing to my

15    left.

16             THE COURT:  Good morning.  Everyone can be seated.

17             Ms. Haramati, is there any legal reason that we

18    should not proceed with sentencing this morning?

19             MS. HARAMATI:  No, your Honor.

20             THE COURT:  There has been filed a presentence

21    report and an addenda to that report.  Did you review that

22    material your client, Mr. Singh?

23             MS. HARAMATI:  I did, your Honor, we reviewed both

24    in great detail.

25             THE COURT:  Mr. Singh, did you review both your

PROCEEDINGS

1   presentence report and the addenda to that report with your

2   counsel?

3                THE DEFENDANT:  Yes.

4                THE COURT:  Are you satisfied to have her represent

5   you?

6                THE DEFENDANT:  I'm very satisfied with her, yes.

7                THE COURT:  Now I have, as I've mentioned earlier at

8   the last proceeding, I have sentencing submissions on the

9   defendant's behalf and I have sentencing submissions from the

10  government.  There were also submissions regarding ancillary

11  issues regarding restitution and forfeiture.  And I just want

12  to, for the record, confirm that the forfeiture order that was

13  most recently provided to the Court, which has a forfeiture

14  amount of $3,018,602.22 is the forfeiture amount that has been

15  agreed upon by both parties.  Is that correct from the

16  government's perspective?

17               MR. GIBALDI:  Yes, your Honor.

18               MS. HARAMATI:  Yes, your Honor, it is the correct

19  amount.

20               THE COURT:  I will sign that forfeiture order and

21  when it becomes time append it to the order of judgment and

22  conviction.

23               Now we have certain issues outstanding with regard

24  to the restitution.  Now if I understand it correctly, the

25  restitution amount without interest, without prejudgment

PROCEEDINGS

1    interest is $4,651,845.08; is that correct, that's without --

2         MR. GIBALDI:  That's correct from the government,

3    your Honor.

4         THE COURT:  But the government indicates that it

5    should be a higher number because they believe prejudgment

6    interest is appropriate, correct?

7         MR. GIBALDI:  That's right, your Honor.  I believe

8    that we both agree on the amount of money, if you don't

9    include the interest, and the dispute is about just whether

10   interest should be applied.

11        THE COURT:  Okay.  Let me resolve these financial

12   issues initially.

13        Here the government seeks both prejudgment and

14   post-judgment interest on restitution award under -- against

15   the defendant Jasminder Singh under the MVRA.  Post-judgment

16   interest on restitution awards is governed by 18 U.S.C.

17   3612(f) and that provision requires post-judgment interest

18   unless the Court determines that the defendant does not have

19   the ability to pay interest, in which case the Court may waive

20   the requirement for interest or limit it in other matters.

21        On the other hand, the Congress has not spoken

22   specifically to the availability of prejudgment interest,

23   that's U.S. versus Qurashi, 634 F.3d 699-703, Second Circuit

24   2001 -- excuse me, 2011.  However, the Second Circuit has held

25   that the MVRA allows the sentencing court to award prejudgment

PROCEEDINGS

1    interest in a criminal restitution order to ensure

2    compensation in the full amount of each victim's losses, but

3    has indicated that such interest would be improper when it did

4    not constitute an actual loss.  And the burden of establishing

5    the actual amount of the loss sustained by a victim as a

6    result of an event is on the government and any dispute about

7    the proper amount of restitution should be resolved by the

8    government by a preponderance of the evidence.

9         I'm not going to award either post-judgment or

10   prejudgment interest here.  As for post-judgment interest, I

11   find that the defendant does not have the ability to pay that

12   interest in light of the substantial amount of money that he

13   owes pursuant to a forfeiture as well as the amount of the

14   restitution.

15        Prejudgment interest, admittedly, is a closer

16   question.  I'm not satisfied that the government has

17   demonstrated by a preponderance of the evidence that the

18   amount of loss sustained by American Express should include

19   prejudgment interest.  I don't think it's been shown that

20   American Express sustained a loss any greater than the

21   principal that the defendant stole given the possibility that

22   American Express could have employed accounting practices that

23   diminished the amount of the loss.

24        So I'm not going to award either prejudgment

25   interest or post-judgment interest, which would make the

PROCEEDINGS

1    amount of restitution the number the Court stated earlier.

2            Now, the defendant has challenged the guideline

3    range that is set forth in the presentence report, both the

4    government and probation maintain that that guideline range is

5    accurate, it's 70 to 87 months.

6            I understand that you've challenged that guideline

7    range, Ms. Haramati, but are there any other -- is there any

8    other factual information or other challenges to either the

9    guideline range or any facts in the presentence report?

10           MS. HARAMATI:  No, your Honor.

11           THE COURT:  I don't know that there's any need, I've

12   read the submissions by both parties on this issue I'm

13   prepared to rule on it, unless there is something else,

14   Ms. Haramati, that you think needs to be added to the

15   submissions you've already filed.

16           MS. HARAMATI:  No, I think the submission accurately

17   outlines our position.

18           THE COURT:  All right, thank you.

19           The defendant argues that the two level guideline

20   increase under 3B1.1(c) is improper.  That section applies to

21   a defendant who was an organizer, leader, manager or

22   supervisor in any criminal activity.  The defendant argues

23   that although he managed Rajpreet Kaur and Mandeep Singh in a

24   legitimate cell phone export business, he did not manage them

25   in any criminal activity because he was acquitted of the

PROCEEDINGS

1   conspiracy.

2        Section 3B1.1(c) applies if, quote, it is shown by a

3   preponderance of the evidence that a defendant was an

4   organizer, leader, manager or supervisor of another criminally

5   responsible participant in the criminal scheme.  That's *United*

6   *States versus Brinkworth*, 68 F.3d 633, 641, Second Circuit

7   1995.  But it is equally clear that criminally responsible

8   does not mean, quote, convicted.  *United States versus Gaskin*,

9   364 F.3d 438 at 467, Second Circuit, 2004.

10        Accordingly, in *United States versus Al-Sadawi* at

11   432 F.3d 419, Second Circuit 2005, the Second Circuit

12   confirmed the application of 3B1.1 to a defendant who managed

13   his father, who himself, that is the father, was acquitted of

14   any wrongdoing because the Court found that the District

15   Court's conclusion that the defendant recruited his father

16   into the conspiracy was well-grounded in the record.

17        Similarly, in *Gaskin* the defendant argued that he

18   was not a manager because any potential participants were

19   either not themselves convicted or were involved in the

20   substantive crimes for which he was acquitted.  The Second

21   Circuit expressly rejected that reasoning and instead

22   considering the totality of the trial evidence to determine

23   whether *Gaskin* had managed others.

24        First of all, I would note that the finding that the

25   defendant managed others, the fact that he was acquitted of

8

PROCEEDINGS

1  the conspiracy is really not relevant to that issue because he

2  was convicted of the substantive count of bank fraud and one

3  can direct others in the substantive count.

4          Here, the government has shown by a preponderance of

5  the evidence that the defendant Jasminder Singh directed

6  Mandeep Singh to engage in activity if furtherance of his bank

7  fraud and money laundering scheme, and that Mandeep Singh was

8  criminally responsible for his actions.  Specifically, Mandeep

9  Singh pled guilty to committing concealment money laundering.

10 In his plea allocution he admitted that he knew the iPhones

11 were being purchased with American Express cards with no

12 intention of paying the credit cards back.

13         He further allocuted that he transferred $455,000

14 from his Quick Wholesale account to Jasminder Singh in

15 January 2018 with the intent to conceal that Quick Wholesale

16 had been in receipt of money from its buyers that was owed to

17 American Express.

18         At trial Mandeep Singh again testified that he

19 transferred money from his Quick Wholesale account to

20 Jasminder Singh's account at Jasminder Singh's direction.  He

21 again testified that the purpose of the transfer was that

22 money had been concealed from American Express.  Mandeep Singh

23 further testified that he received a phone call from American

24 Express, after making the Quick Wholesale transaction, and on

25 that phone call he told American Express that he would pay the

PROCEEDINGS

1    money back, the money he owed once his buyer paid him.  He

2    testified that what he told American Express was a lie because

3    the money had been transferred to Jasminder Singh's account

4    and that he told the lie at Jasminder Singh's direction.

5          The defendant identifies supposed contradiction in

6    Mandeep Singh's testimony from which I should conclude,

7    according to the defense, that Mandeep Singh was not

8    criminally responsible for his actions in furtherance of the

9    scheme.  For example, he highlights the testimony which

10   Mandeep Singh stated that when he undertook the Quick

11   Wholesale transaction he thought Jasminder Singh would pay

12   back the American Express bills, that he did not know that

13   American Express was not being paid until the company called

14   him weeks after the Quick Wholesale transaction.  Further, he

15   points to testimony that Jasminder Singh told him to pay a

16   large American Express bill first before making the transfer

17   and that he would reimburse Singh later.

18         As the government points out though, the defendant's

19   description of the testimony is somewhat misleading.  For

20   example, Mandeep's explanation that he did not speak with the

21   defendant about the issues with American Express until he

22   received a call from American Express could simply mean did he

23   not know that American Express had identified the fraud until

24   that point.  In another testimony that defendant highlights

25   from Mandeep's cross-examination, the defense solicited only

PROCEEDINGS

1    that Mandeep had previously made exculpatory statements in a

2    pre-plea meeting with the government, but on direct

3    examination Mandeep stated that his pre-plea statements were

4    dishonest because he was extremely scared and fearful.  To the

5    extent defense counsel did elicit contradictions on

6    cross-examination, I find that considering all of Mandeep's

7    testimony, the way that the evidence suggests clearly

8    Mandeep's criminal responsibility for the Quick Wholesale

9    transfer as so clearly admitted in his allocution at the time

10   of his plea.

11           And I should also note that none of the

12   contradictory testimony highlighted by the defense contradicts

13   Mandeep Singh's testimony that he lied to American Express at

14   Jasminder Singh behest for the purposes of furthering

15   Jasminder Singh's scheme.

16           Accordingly, because I find that Jasminder Singh

17   directed Mandeep Singh in furtherance of this criminal scheme

18   and that Mandeep Singh was criminally responsible, 3B1.1(c)

19   applies.

20           So as I am required to do, procedurally, I find -- I

21   reject the challenge made by the defense to the guideline

22   calculation here and find that the total offense level is 27,

23   Criminal History Category I, which is a guideline range of 70

24   to 87 months.

25           Now, I have a thorough sentencing memorandum made on

PROCEEDINGS

1    the defendant's behalf, I have a response from the government,

2    but, Ms. Haramati, do you want to be further heard on where

3    the Court -- on the Court's sentence?

4              MS. HARAMATI:  Yes, your Honor.

5              May I take off my mask?

6              THE COURT:  Yes.

7              MS. HARAMATI:  Your Honor, we've spent the last

8    several days even focused on the arithmetic parts of the

9    sentencing, the guidelines portion, the loss calculation, the

10   restitution award, but the part of the sentencing that we're

11   turning to now is of course the most important part where your

12   Honor must determine what sentence is sufficient, but not

13   greater than necessary for Mr. Singh.  This is the human part

14   of sentencing that affects Mr. Singh's family, perhaps more

15   than anything else that has happened in their lives.  So the

16   question is what sentence is sufficient, but not greater than

17   necessary for Jasminder Singh.  And I submit to your Honor

18   that it is not one based on the guidelines which are just

19   driven by school math and tables, but instead it is a sentence

20   that considers who Jasminder Singh is as a person.

21              Mr. Singh is, of course, much more than just the

22   criminal conduct that your Honor has heard about during the

23   trial in this case.  He is a devoted father of two severely

24   disabled children.  He is a man who has suffered tragic loss

25   in his life through the early untimely deaths of two of his

PROCEEDINGS

1    brothers when they were just young men.  He's a devoted member

2    of the Sikh community.  He is an unusually compassionate and

3    charitable person, who I've really gotten to know in the last

4    year plus of representing him.  He routinely opens his home to

5    people who have nowhere to sleep who he meets in his temple,

6    and he literally takes the homeless in to his home, which I

7    think is something, you know, that I have rarely seen in my

8    life from even the most generous person.

9            Mr. Singh is also going to be deported and separated

10   from his precious children.

11           THE COURT:  How are you sure of that?  Is there a

12   detainer?

13           MS. HARAMATI:  There is no detainer now as he is

14   released on bail he wouldn't be in immigration detention.

15           THE COURT:  Right.

16           MS. HARAMATI:  I did look into this after the

17   colloquy we had earlier and my understanding is that the BOP

18   alerts the immigration authorities when there is somebody who

19   is going to -- with a removable offense once they are inside

20   the BOP.

21           THE COURT:  And that's not something he intends to

22   fight, he's not going to claim asylum, he's not going to make

23   arguments as to why he should not be deported?

24           MS. HARAMATI:  My best understanding, after speaking

25   with some -- with an immigration lawyer on this, is that

PROCEEDINGS

1    those -- he can try to fight, but that those routes are

2    virtually unavailable to him once he's been convicted of the

3    aggravated felony here.  So the only possible hope he would

4    have to stay here is if somehow he flew under the radar and he

5    was never picked up by immigration authorities, but I think

6    once you report to a BOP facility that is vanishingly

7    unlikely.

8           So I think it's -- I mean, at least also in my

9    experience of representing several undocumented people who

10   were then incarcerated.

11          THE COURT:  What is his current status, he's

12   undocumented?

13          MS. HARAMATI:  No, he has a green card application

14   pending, which no doubt will be rejected once the judgment and

15   conviction is entered in this case, your Honor.

16          I think, you know, as was really a centerpiece of my

17   sentencing presentation and I think a centerpiece of what the

18   3553(a) factors would require consideration of in Mr. Singh's

19   case, his deportation is virtually certain and so it is a very

20   appropriate consideration as a collateral consequence of his

21   conviction for your Honor in crafting what is an appropriate

22   sentence for Mr. Singh.

23          And so I do want to get to that in a moment, just

24   the way in which his deportation is certainly going to impact

25   his family and of course himself, but I do want to just turn

PROCEEDINGS

1  briefly to a little bit of a further description of

2  Mr. Singh's relationship with his children for your Honor to

3  consider just to highlight a few brief points.

4            THE COURT:  Well, he lives across the country from

5  his children, correct?  He was in California --

6            MS. HARAMATI:  He does live across --

7            THE COURT:  -- and his wife is the primary -- his

8  former wife, Ms. Kaur, his co-defendant, is the primary

9  caretaker for the children, correct?

10            MS. HARAMATI:  That is correct.  He is -- however, I

11  think still as Ms. Kaur's letter to the Court really

12  illustrates, he is very deeply involved and maintains a close

13  relationship with his children.  He speaks --

14            THE COURT:  He has children in India too, as well,

15  grown children in India?

16            MS. HARAMATI:  He has grown children who are, I

17  think, in their mid twenties.

18            He is uncommonly close with his two disabled

19  adolescent children that he has -- that he has here and who I

20  think really rely on him not just -- certainly emotionally

21  they rely on him they speak every day and as Ms. Kaur

22  identified in her letter to your Honor, prior to this case,

23  since his arrest last year, they routinely spent weeks at a

24  time with him just when they were out of school.  So he has

25  maintained a very, very close relationship with his children

PROCEEDINGS

1    and that relationship is, as Ms. Kaur identified and some of

2    the other letters, the letter also from Mr. Singh's sister

3    Harpreet -- and I do just want to note for the Court that

4    Mr. Singh's sister is Harpreet is here and Ms. Kaur is here

5    and his niece and his nephew are also here all to support him

6    on this most important day in his life.

7         Both Ms. Kaur and Mr. Singh's sister really

8    illustrated for the Court how -- how difficult it is -- you

9    know, will be for Mr. Singh's disabled children to be without

10   him.

11        THE COURT:  But when he was engaging in these

12   schemes, Ms. Haramati, he knew, and every defendant has to

13   recognize, that by taking these actions they expose themself

14   to a prison term and are threatening the health and livelihood

15   of their children.

16        MS. HARAMATI:  That is certainly true, your Honor,

17   but I think under the 3553(a) factors, which -- and under

18   3553(a) which requires the Court to make an independent

19   determination of what sentence is sufficient, but not greater

20   than necessary and what constitutes just punishment, it is, I

21   think, still necessary for your Honor to independently

22   consider what the impact will be on Mr. Singh and on his

23   family even though of course, you know, Mr. Singh should have

24   realized that as a consequence of a conviction there would be

25   collateral consequences, but that doesn't, I think, diminish

PROCEEDINGS

1  their weight in consideration of what sentence is sufficient,

2  but not greater than necessary.

3          THE COURT:  Okay.

4          MS. HARAMATI:  So just I mean to briefly highlight

5  for, your Honor, Mr. Singh's daughter she -- let me just say

6  this.  Mr. Singh's both his son and his daughter will never be

7  able to understand what has happened to their father.  They

8  will never be able to understand why he's not with them, why

9  he's been deported or why he's been sentenced.  They won't be

10 able to understand why they can't be together or see each

11 other on a regular basis as they did even when he lived in

12 California.  California is far but India is much, much

13 further.  And crucially --

14         THE COURT:  Are they incapable of traveling?

15         MS. HARAMATI:  They are capable of traveling.

16         THE COURT:  They could travel to India to see --

17         MS. HARAMATI:  They could travel and visit India but

18 as I laid out in my sentencing submission the resources --

19 these are two, you know, American children with very severe

20 intellectual disabilities.  They rely very heavily on the care

21 that they receive here through the New York City public school

22 system and through other --

23         THE COURT:  No, I'm just talking about visits, I'm

24 not talking about the fact that they should live in India, I

25 don't -- I recognize your argument as to why that's not a

PROCEEDINGS

1  viable option for children with these types of disabilities,

2  but there would be nothing that would prevent them from

3  visiting their father in India.

4          MS. HARAMATI:  As far as I understand, they could

5  make, you know, brief visits to India during summer vacations

6  and things like that, but of course they're in school most of

7  the time because they are still children.

8          And -- I think there is a very vast difference

9  between even living in the same country as your children even

10  when you don't live together and living literally half a world

11  away.

12          The other consideration that I think is significant

13  just in this vain for your Honor is in determining what's an

14  appropriate prison sentence, is that by all accounts Mr. Singh

15  and Ms. Kaur divided the family responsibilities, which were

16  very great, given the disabilities of their children.  He was

17  the day-to-day caretaker of the children even when the couple

18  was married and since -- and he was the financial supporter of

19  the family.  Even if -- when Mr. Singh is deported to India he

20  will still be able to, of course, financially support his

21  family, there is nothing that stops him from earning money

22  there and sending some back to his children, but a lengthy

23  period of incarceration before his deportation will really

24  severely undermine his ability to support his children, you

25  know, through the rest of their --

PROCEEDINGS

1    THE COURT:  Isn't his ex-wife remarried?

2    MS. HARAMATI:  She is remarried.  I don't know the

3  status of their marriage, but I understand from her and from

4  what she -- I understand from just their family financial

5  picture is that she relies almost exclusively on Mr. Singh

6  from their -- the family court decision and spousal support

7  decision from their divorce to support herself and her two

8  children.  And, you know, she lives in a house that belongs to

9  Mr. Singh, which may very well get foreclosed upon in order to

10  satisfy the -- you know, the very high restitution and

11  forfeiture awards in this case, which I think makes the issue

12  of Mr. Singh's ability to provide financially for his children

13  even more acute because there will not realistically be a

14  safety net.

15    THE COURT:  But that property that she lives in here

16  is not the subject of any forfeiture order, correct?

17    MS. HARAMATI:  It is not, but Mr. Singh's primary

18  residence is the subject of the forfeiture order.  It may take

19  some time for the Department of Justice to come for

20  Mr. Singh's other assets, but it is my understanding that he

21  does not have vast liquid assets to satisfy a 4 million-dollar

22  restitution judgment to say nothing of the --

23    THE COURT:  It's 3 million, isn't it.

24    MS. HARAMATI:  3 million-dollar rest --

25    THE COURT:  I'm sorry, it's a 3 million order of

PROCEEDINGS

1    forfeiture.

2              MS. HARAMATI:  3 million order of forfeiture and

3    4 million restitution.

4              THE COURT:  Yes, you're correct.

5              MS. HARAMATI:  He does not have that level of liquid

6    assets.  I think even his real estate assets won't satisfy

7    that amount and so I think realistically it's only a matter of

8    time before the Department of Justice comes to, you know,

9    seize his other assets.  And so realistically --

10             THE COURT:  Is the home his wife lives in his asset?

11             MS. HARAMATI:  Yes, the home and there's a rental

12   property next door.

13             THE COURT:  And they're both in his name owned by

14   him?

15             MS. HARAMATI:  Yes, they are both in his name.  I

16   think that was a fact that was presented also during the trial

17   in this case.

18             So I mean given the realities of the family's needs

19   and the financial picture, Mr. Singh's ability to provide for

20   his children so that Ms. Kaur can focus on taking care of

21   them, is a very significant consideration in my mind for

22   determining what is an appropriate term of incarceration for

23   Mr. Singh.

24             I, you know -- I really would not want a situation,

25   you know, I've spoken to Ms. Kaur and some of the other family

PROCEEDINGS

1   members, there is a very small safety net in terms of a family

2   safety net for Mr. Singh and Ms. Kaur here in the United

3   States.  They both have family members in India, but in terms

4   of who would come and help care for the children if Ms. Kaur

5   has to get to work and financially support everybody, I think

6   there is a real risk that there might be nobody there when the

7   children come home from school.

8        So I think that given those realities and I think

9   really given the -- let's say, a non-guidelines prison

10  sentence is appropriate.  I would suggest to your Honor that a

11  year and a day is the appropriate sentence here because a very

12  lengthy guideline sentence is certain to harm Mr. Singh's

13  children far more than it harms him.

14       And, you know, I know that I focused a lot on this

15  in the sentencing memorandum, but I think it bears emphasis

16  that Mr. Singh's deportation will just have a vast human toll

17  on him and on his children, on his entire family.  I mean, of

18  course your Honor is correct that his children could come and

19  visit, but we're talking, I think, realistically about

20  permanent family separation given the reality of his

21  children's disabilities.  That is, I think, unthinkable for

22  any parent and it's -- I know that your Honor has doubtless

23  seen many, many cases where a parent is deported following a

24  criminal conviction, but because particularly of Mr. Singh's

25  children's disabilities and the fact that it is just -- it

PROCEEDINGS

1    will never be possible for them to even consider moving to

2    India because of the support services that they need, I think

3    that that makes Mr. Singh's case a special one or at least a

4    different one than most cases where a defendant is a

5    non-citizen.  The reality is his children -- most children

6    when they grow up they can decide where they want to live,

7    which parent they want to live with, that will not be the case

8    for Mr. Singh.  If he lives in India, which he certainly -- I

9    think almost certainly will, he will never be united

10   permanently with his children.  There is simply no choice for

11   his family.

12           THE COURT:  How long has he been separated from his

13   other children.  You said he has children in their twenties.

14   How long -- they've lived in India, correct?

15           MS. HARAMATI:  They have lived in India --

16           THE COURT:  He's been separated from them I guess

17   for some time, what is his relationship with those children?

18           MS. HARAMATI:  I think he has very close

19   relationship with those children.  They are not disabled.

20   They are able to foster, you know, I think a regular, a more

21   regular relationship.  I think he did also go back and visit

22   them and they have been in touch throughout this time.  And

23   he, I believe, supported them, assisted in their financial

24   support also throughout their childhoods.

25           But, you know, I certainly take your Honor's point,

PROCEEDINGS

1    but I do think that there is a difference here, because of

2    how -- because of his American children's disabilities.

3    There's already a special kind of care and relationship that

4    Mr. Singh has to foster with those children and it is of a

5    different nature and I think of a different import than even

6    an ordinary parent/child relationship.

7            You know, and the case law on the Second -- both in

8    this district and in the Second Circuit under *United States*

9    *versus Stewart* emphasized that -- this is a quote from

10   *Stewart*, that the court report, quote, cannot properly

11   calibrate a just punishment if it does not consider the

12   collateral effects of a particular sentence.  That is exactly

13   what I'm asking the Court to do here with respect to

14   Mr. Singh's deportation and separation from his children, is

15   what is the just punishment here.  It's a punishment that

16   takes account of the real cruelty of the immigration system

17   that is, you know, cold and humanless and --

18           THE COURT:  Why is it cruel?  I don't understand

19   that.  If someone comes here and doesn't regularize their

20   status and then engages in felony conduct, why is it cruel

21   that that person is deported from the country?  I don't

22   understand why that's cruel.

23           MS. HARAMATI:  I think it's the human -- maybe cruel

24   is the wrong word.  It has a real human cost.  I'm not

25   suggesting that the law was crafted in an intentionally mean

PROCEEDINGS

1    manner or something like that --

2          THE COURT:  I recognize your comment about how these

3    things are a human cost to family, but to suggest that somehow

4    the system is cruel or wrong, I don't understand that.  I

5    mean, we have certain rules that one has to follow.  Many

6    people come to this country, immigrants come to this country

7    and legally regularize their status and become some of the

8    strongest citizens of the United States.  You know, others

9    don't.  Others come here and they don't have status and they

10   commit crimes.  And I don't know why you think that a system

11   would be cruel to suggest that those people would be required

12   to leave the country.

13         MS. HARAMATI:  I'm not suggesting that, it was a

14   wrong word on my part.  I am just suggesting that your Honor

15   consider the human cost to Mr. Singh and his family.

16         I have just one more aspect --

17         THE COURT:  Sure.

18         MS. HARAMATI:  -- of the deportation consequences

19   that I want to flag for your Honor which was, I think really

20   fleshed out by Mr. Singh's sister Harpreet.  One of the

21   reasons that Mr. Singh came here in the first place was the

22   religious discrimination and violence against members of the

23   Sikh community that he faced personally and that were very

24   virulent throughout his childhood.  There was, as I briefly

25   described in the sentencing submission and as Mr. Singh's

PROCEEDINGS

1    sister described, when he was just a small child there were

2    political tensions between Sikh people and Hindu people that

3    resulted in a horrific wave of anti-Sikh violence that swept

4    through India.  There were roving mobs of violent members of

5    the community who indiscriminately were attacking people who

6    were readily identifiable as Sikh by their religious garb.  In

7    just days, thousands of people Sikh people were murdered.

8    Mr. Singh himself as a small boy had to hide his religion,

9    dress up like in girls clothes so that he would be able to go

10   out in safety during that time.  His own grandfather was

11   attacked and, of course that was years ago, but my research

12   and speaking to Mr. Singh and his family shows that religious

13   persecution for Sikh people in India remains very significant

14   even today.  There's still -- you know, the law itself does

15   not treat Sikh -- members of the Sikh religion the same as

16   members of the dominant Hindu religion in India.  So that is

17   just another hardship that Mr. Singh is certain to face when

18   he goes back to India that I think is appropriate for the

19   Court to consider as an aspect of the real personal toll that

20   this is going to take on Mr. Singh.

21           Just moving to some of the other 3553(a) factors for

22   your Honor's consideration.  Of course, 3553(a) also directs

23   the Court to consider specific and general deterrents and

24   promoting respect for the law.  You know, because of these

25   same deportation consequences, I think a long guideline

PROCEEDINGS

1  sentence is also unnecessary to achieve any of those goals.  I

2  would submit that a sentence of a year and a day is really

3  sufficient, but not greater than necessary to achieve those.

4          With respect to specific deterrents, Mr. Singh was

5  never a very great recidivism risk.  According to the

6  sentencing statistics people with his profile, a person in his

7  late 40's a first-time white collar offender has virtually

8  zero chance of recidivating and --

9          THE COURT:  Of course, he never accepted

10  responsibility for what he's done which suggests some concern

11  about specific deterrents.

12          MS. HARAMATI:  Well, your Honor, I have just two

13  responses.  The first is, I don't think that exercising your

14  constitutional rights to defend your innocence is something

15  that makes you more likely to recidivate.  I think it's

16  obviously well within his rights to challenge the government,

17  put the government to its proof --

18          THE COURT:  I think we're talking about two

19  different things.  It's clearly within his rights to put the

20  government to its proof and he did that and that's not

21  something that should in any way be held against him.  But

22  it's not as if, when you think about someone who has pled

23  guilty then they have accepted responsibility in a way that

24  suggests deterrents is less of a concern for that type of

25  person.  That just seems to be common sense.  Maybe I'm wrong

PROCEEDINGS

1    about that.

2            MS. HARAMATI:  Well, two things.  First of all, I

3    think the reality is that, you know, if Mr. Singh were to get

4    up now and accept full responsibility, any potential appeal

5    would, I think, really be nullified --

6            THE COURT:  Well, that's his choice.

7            MS. HARAMATI:  Of course, that's his choice, but

8    that is part of fully exercising his constitutional rights to

9    defend his innocence under our law, but I do want to more I

10   think directly address your Honor's point.

11            I do think that going through as a -- you know,

12   getting to know Mr. Singh and other defendants who have gone

13   through trial, going through the rigors of the criminal

14   justice system, sitting through a criminal trial is very

15   difficult and stressful for any defendant, seeing the worse

16   things you've ever done or you've ever been accused of in your

17   life paraded in a courtroom in great detail for the whole

18   world to see and for the entire public to come in and then

19   having a jury of your peers pronounce judgment against you, is

20   a kind of stressful experience that I think nobody would want

21   to repeat.  And I can tell you just knowing Mr. Singh and

22   seeing how it has affected him, obviously I cannot predict the

23   future but I don't -- he does not strike me as the kind of

24   person who is acting with impunity just because he wants to

25   exercise his constitutional rights and protect his right to an

PROCEEDINGS

1    appeal should -- if that is what he wishes to do.

2              But, you know, and of course just in terms of his

3    specific deterrents, the fact that he will not be here any

4    more obviously I think was -- a court in this district pointed

5    out *United States versus Chin Chong*, which I cited in my

6    sentencing memorandum, it specifically notes with respect to

7    the consideration of specific deterrents that if a person is

8    deported and is no longer here, the American public is

9    automatically protected from that person's future risk of

10   recidivism.

11             THE COURT:  Well, I guess it's easy to recidivate

12   from outside the country if you engage in frauds as opposed

13   to, you know, assault or murders or something like that, that

14   would happen here.  I mean, frauds can be executed from a

15   foreign country in the United States, correct?

16             MS. HARAMATI:  I guess theoretically, but I think

17   that risk is really vanishingly low.  The idea that, for

18   example, that banks or credit cards would give Mr. Singh an

19   opportunity to do something similar to what he has done here,

20   which he could theoretically do from aboard, in my experience

21   criminal defendants and people who have been convicted do not

22   get bank accounts at major financial institutions or at credit

23   card companies, and so I think realistically that's a very --

24   it's a possibility I guess, but I think it's a very, very low

25   possibility.

PROCEEDINGS

1          Just to briefly address the general deterrents,

2     which I know for many courts is an important point

3     particularly with regard to a financial crime.  In a case like

4     this, because Mr. Singh is going to be separated from his

5     family, I don't think that anybody who was considering a

6     similar crime, a white collar crime would look at Mr. Singh's

7     case and think well, that crime paid, so maybe I also get away

8     with it.  Whatever jail sentence your Honor imposes on

9     Mr. Singh, he will have a lifetime of consequences and so I

10    think that in itself provides adequate general deterrents and

11    by the same token I think it really promotes respect for the

12    law, which is another one of the 3553(a) factors of course for

13    your Honor to consider.

14          So I think as a whole based on, you know, the

15    consideration mapped out in 3553(a), I would strongly urge and

16    request that your Honor impose a sentence of a year and a day

17    as sufficient, but not greater than necessary on Mr. Singh.

18          You know, I do want to briefly point out one final

19    thing before I sit down.  It's hard to believe almost two and

20    a half years after the start of the COVID-19 pandemic that

21    we're even still talking about this but, you know, I think

22    it's kind of harder to believe that the Bureau of Prisons

23    hasn't found a more humane and, let's say, administratively

24    easier way to deal with COVID.  All of us --

25          THE COURT:  I'm not sure the country has found a

PROCEEDINGS

1  good way to deal with COVID, Ms. Haramati, so I don't know

2  that we should fault just the Bureau of Prisons.

3          MS. HARAMATI:  I'm certainly do not fault just the

4  Bureau of Prisons, but each of us of course has to make our

5  own COVID decisions every single day, but the reality is that

6  most of us have gone back to our normal lives.  Whereas, if

7  the conditions in the Bureau of Prisons, in any facility I

8  think in the entire country, is not the same as it was prior

9  to the pandemic.  There's still prolonged quarantine isolation

10 periods even for non-violent inmates with no disciplinary

11 record.  Every time there is a COVID exposers, if a person is

12 transferred to a new facility, comes into a facility or is

13 leaving a facility they are put into isolation under the BOP

14 guidelines, and based on the people that I know who are

15 currently in BOP facilities, that is still also -- it's not

16 just the guidelines, it is the reality of what is happening to

17 BOP inmates.  And so, you know, it's not through any malice, I

18 would say, on the part of the BOP, but the fact is that from

19 the perspective of an inmate, time inside is still much, much

20 harsher than it would be in non-COVID times.

21          So, you know, on that basis and, you know, I'll also

22 on the basis of the family and human toll that I've already, I

23 think, laid out in great detail, the difficulty in the future

24 that awaits Mr. Singh's family, his two disabled children that

25 he will never be able to live with again, I ask your Honor to

PROCEEDINGS

1   impose a sentence of a year and a day as sufficient, but not

2   greater than necessary for Mr. Singh's conviction.

3          THE COURT:  Thank you, Ms. Haramati.  Before I hear

4   from Mr. Singh, I don't know whether he wishes to speak or

5   not, but I will give him the opportunity to have the last word

6   but let me hear from the government.

7          MR. GIBALDI:  Thank you, your Honor.  I'll be brief,

8   as I know your Honor has our letter and is obviously presided

9   over the entire trial in the case so is very familiar with the

10  facts of this case.

11         I just want to underscore a few things that I think

12  are readily apparent from the trial record that also go to I

13  think another part of who the defendant is as a person.  He

14  was certainly the mastermind of this crime, I don't think

15  there's really any doubt about that, and it involved many

16  levels of deception.  Certainly deception of American Express

17  through deceptive methods of payment and impersonating other

18  people on telephone calls and lying and telling other people

19  to lie.

20         I think it also involved deception and using other

21  people that were close to him, including his co-defendants

22  Rajpreet Kaur and Mandeep Singh.  Look, obviously the

23  government's position, the government charged all three and

24  believes that all three made their own decisions, including

25  Ms. Kaur and Mr. Mandeep Singh, but I also think that it's

PROCEEDINGS

1   very true from the trial record, very clear that it was the

2   defendant Jasminder Singh who pulled his wife and his friend

3   from the Sikh temple into this crime.  I don't think there was

4   really any suggestion that they were engaging in this absent

5   Jasminder Singh and the direction that he was providing.  And

6   so, frankly, whether you look at it as co-conspirators working

7   at Jasminder Singh's direction or as people who were duped

8   into doing things at Jasminder Singh's behalf, either way it

9   really reflects I think very poorly on Jasminder Singh because

10  he was using these other people primarily to enrich himself

11  because of course the vast majority of the money he kept for

12  himself.

13          And I think that this was calculated crime.  Not --

14  there was no moment where there was a -- where you can point

15  to one particular lapse in judgment, it lasted for months and

16  because it involved many levels of deception, certainly the

17  defendant had plenty of time to consider the impact that this

18  crime would have not just on himself but on the people around

19  him, including his family.  And of course there is no doubt

20  that this all has a human cost on innocent people.  There is

21  no suggestion of course that his children did anything to

22  deserve this, of course they didn't, but the defendant

23  certainly had plenty of time to think about that and reflect

24  upon all the consequences that his actions would have when he

25  engaged in this crime over many months.

PROCEEDINGS

1          So really for that reason as well as the other

2   reasons in our letter, general deterrents as well, which we've

3   set forth in our letter the reasons why general deterrents is

4   important here, the government is requesting a sentence within

5   the applicable guidelines range.  So unless your Honor has any

6   additional questions we'll rest on the submission.

7          THE COURT:  I don't.  Let me ask, Mr. Singh, do you

8   want to say anything before the Court imposes sentence?

9          THE DEFENDANT:  I just want to say sorry to my

10  family.

11         THE COURT:  Okay, anything else?

12         THE DEFENDANT:  That will be all.

13         THE COURT:  All right.

14         First of all, let me just say that I've thoroughly

15  read and considered the submissions made on the defendant's

16  behalf as well as the government's letter.  I presided over

17  the trial of his case so I'm very familiar with the extent of

18  the crimes here.

19         I've taken into account the guideline range here,

20  the bottom of the guideline range is 70 months.  I've

21  considered the statements so eloquently made on Mr. Singh's

22  behalf by his counsel, and I've as well considered some of the

23  cogent points that the government has raised in response.

24         The Court's difficult task is to impose a sentence

25  that's sufficient, but not greater than necessary to comply

PROCEEDINGS

1  with the purposes set forth in that section and to identify --

2  I've considered all of them but let me just identify some of

3  them.

4           Well, first of all, I have to take into account the

5  nature and circumstances of the offense, the history and

6  characteristics of the defendant, the need for the sentence

7  imposed to reflect the seriousness of the offense, to promote

8  respect for the law, to provide just punishment.

9           Now, considering, first of all, the history and

10  characteristics of the defendant.  Counsel has pointed out

11  that the defendant has had a difficult time, a series of

12  tragedies, religious discrimination in his youth, I recognize

13  it is part of his history and characteristics, but they don't

14  suggest that they were any reason for his engaging in criminal

15  activity, nor that -- his counsel made that argument, she's

16  just pointing out that it's important for the Court to take

17  those kinds of things into account.

18           I've taken into account that prior to this, engaging

19  in this scheme the defendant had no criminal history.  The

20  government doesn't dispute that prior to beginning this scheme

21  he ran a legitimate business.

22           I've taken into account the arguments made by the

23  defense on his role in caring for the children and the

24  possibility that he will be deported, his community service,

25  the letters written on his behalf.  And I have, in fashioning

PROCEEDINGS

1    a sentence, as I said earlier, taken into account favorably to

2    him, his children's situation.  But I should note that the

3    defendant should recognize that the harm that is necessarily

4    going to happen to his children he bears responsibility for

5    that.  And I also note, as you know the government pointed

6    out, he involved his former wife in this criminal activity and

7    she was the children's primary caretaker.  It's this Court's

8    view that there was sufficient evidence for the jury to have

9    found beyond a reasonable doubt her culpability in this

10   offense at which time he would put at risk his disabled

11   children having no parent to care for them.  That's not to say

12   that I haven't considered his children and the harm to his

13   children in fashioning an appropriate sentence.

14          Just in terms of the nature and circumstances of the

15   offense, the seriousness of the offense, as the government

16   points out, the crime here was serious, it was calculated.

17   The defendant was the mastermind of a scheme aimed at

18   defrauding the victim, American Express, of millions of

19   dollars and the offense here was just not -- was not just the

20   decision not to pay back a credit card bill, but instead a

21   detailed scheme that involved the use of complex transactions

22   to hide wrongdoing and it took serious planning and

23   forethought.  So it was, in this Court's view, a serious

24   offense.

25          In terms of general deterrents, I think this factor

PROCEEDINGS

1   is important when considering what sentence should be

2   fashioned.  Often crimes such as this are hard to detect and

3   prosecute, white collar -- not white collar, excuse me, I mean

4   fraudulent, serious frauds like this I think have to face a

5   significant penalty for concerns for general deterrents.

6   There has to be a strong disincentive to engage in this

7   activity.

8           Specific deterrents, it's difficult to fully assess

9   this.  It may well be, as counsel points out, that the

10  defendant will not be in a position to engage in this conduct

11  again, so it's not a factor that the Court gives any

12  particular weight to in terms of deciding the appropriate

13  sentence.

14          The Court also has to take into account a factor

15  that hasn't been raised here, but the need to avoid

16  unwarranted sentence disparities among defendants with similar

17  records who have been found guilty of similar conduct.  I am

18  aware of the types of sentence that have been imposed on

19  defendants who have engaged in substantial frauds.

20          As I said, this is always a difficult decision and

21  the record should reflect that, although I noted that the

22  defendant had not accepted responsibility for the crime, that

23  doesn't mean that that's a factor that's being held against

24  him in terms of what the Court determines is an appropriate

25  sentence.  He obviously has the right and exercised the right

PROCEEDINGS

1    to go to trial.

2            So having considered the arguments of counsel,

3    having thoroughly read the papers, the Court believes a

4    sentence that is sufficient, but not greater than necessary to

5    comply with 3553(a), I'm going to sentence the defendant on

6    Count Two to a term of 48 months to be followed by a two-year

7    term of supervised release.  On Count Two I'm ordering the

8    restitution in the amount of $4,651,845.08.

9            I'm imposing a 100-dollar special assessment.

10           I will not further impose a fine because in light of

11   the forfeiture and the restitution amount the defendant

12   doesn't have the ability to pay a fine in my view.

13           In terms of how he pays the restitution, I'm going

14   to make it payable immediately, due immediately and payable at

15   a rate of 25 per quarter while he's in custody and at a rate

16   of 10 percent of his gross monthly income while on supervised

17   release.

18           In terms of conditions of supervised release, all

19   the standard conditions of supervised release apply.  He has

20   to comply with his order of restitution, provide full

21   financial disclosure to the Probation Department, cooperate

22   with the Probation Department in the investigation or approval

23   of any employment, and he shall cooperate and abide by

24   instructions of the immigration authorities and, if deported

25   or excluded, not reenter the country illegally.

PROCEEDINGS

1          There's a 100-dollar assessment that must be imposed

2   on Count Two as well.

3          As to Counts Four and five, I'm going to impose the

4   same 48-month sentence as well as the same supervised release

5   term of two years with the same special conditions.  Now, as

6   to Count Four and Count Five the same sentence will be imposed

7   to run concurrently to the sentence on Count Two.

8          I should note for the purposes of clarity, that

9   Count Four, which was on the verdict sheet was actually Count

10  Seven of the indictment, and what we're calling Count Five was

11  actually Count Eight of the indictment, so that's clear.

12         I'm going to impose a hundred dollar special

13  assessment on Counts Four and five.  They have to run

14  consecutively.  There will be a total of $300 of special

15  assessments.

16         The restitution order I have signed today, I will

17  direct that it be appended to the judgment.

18         Mr. Singh, you have a right to appeal both your

19  sentence and the conviction in this case.  Any Notice of

20  Appeal has to be filed within 14 days.

21         Do you understand that?

22         THE DEFENDANT:  I understand.

23         THE COURT:  Is there anything I've overlooked from

24  the government's perspective?

25         MR. GIBALDI:  Nothing overlooked, your Honor.  I

PROCEEDINGS

1    know you stated at the outset that you'd be also signing the

2    order of forfeiture to go with it.

3          THE COURT:  Yes, I just said that.

4          MR. GIBALDI:  We would -- not a matter overlooked,

5    but we would move to dismiss -- there are three other open

6    counts that we did not proceed to trial on --

7          THE COURT:  All right.

8          MR. GIBALDI:  -- which were Counts Four, Five and

9    Six of the indictment, and so the government would move to

10   dismiss those counts at this time.

11         THE COURT:  All right, the application is granted.

12   Anything further?

13         MS. HARAMATI:  Your Honor, I would only ask that the

14   Court recommend that Mr. Singh serve his sentence at the low

15   facility at FCI Lompoc in California.

16         THE COURT:  I'll tell you what I will -- he wants to

17   be -- where does he want to be imprisoned?  Does he want to be

18   imprisoned closer to his children?  I would think so because

19   they would -- you know, that would probably be an ease of

20   visiting them, correct?  Why wouldn't he want to be near his

21   children?

22         MS. HARAMATI:  One moment, let me just confer with

23   Mr. Singh.

24         THE COURT:  Yes.

25         (Pause in proceedings.)

PROCEEDINGS

1          MS. HARAMATI:  Your Honor, this has to do with his

2   ability to practice his religion in the BOP facilities and

3   this is one that I think he has identified as more

4   Sikh-friendly.  Maybe it's closer to a bigger Sikh community

5   and so he requests to be recommended -- your Honor's

6   recommendation that he be designated there.  Of course, it's

7   within the BOP discretion to make that determination.

8          THE COURT:  It's what type of facility?

9          MS. HARAMATI:  It is closer to a large Sikh

10   community.

11          THE COURT:  Well, how does that help?  He can't get

12   out of prison to go to the large Sikh community, I'm not

13   understanding how that helps.

14          MS. HARAMATI:  I think, just like there are certain

15   prisons that are more -- many Orthodox jews go to, I think

16   there are similar -- I'm not an expert on the California

17   facilities, but my understanding is that this one is closer to

18   the Sikh community and so there's perhaps more members of the

19   Sikh community who are in there.

20          THE COURT:  In prison there?  Why would that make

21   sense?  You know, I usually make recommendations, but to tell

22   the truth, Ms. Haramati, I don't have a basis to do it.  I

23   don't know whether this is an appropriate facility or not, so

24   I'm not inclined to make a recommendation.  It just would be a

25   recommendation that I don't have any factual basis to suggest

PROCEEDINGS

1   it's appropriate.

2           MS. HARAMATI:  Well, your Honor, it is a low

3   facility that is close to his home where he currently lives

4   and --

5           THE COURT:  I would think he would want to be close

6   to his children.  Do you want me to recommended a low impact

7   facility in the northeast region?

8           (Pause in proceedings.)

9           MS. HARAMATI:  Okay, your Honor, if you would

10  recommend a low facility close to the New York metropolitan

11  area, close to family.

12          THE COURT:  All right.  I'll recommend that based on

13  his background if there is an available low intensity facility

14  in the northeast region that he be sentenced there, but it is

15  just a recommendation.

16          MS. HARAMATI:  Thank you, your Honor.

17          THE COURT:  Is this going to be a voluntary

18  surrender?  Does the government oppose that?

19          MR. GIBALDI:  No, we don't oppose that.

20          THE COURT:  Does he want to voluntary surrender,

21  because he has to pay to get there if he does.

22          MS. HARAMATI:  Yes, he does want to voluntarily

23  surrender.

24          THE COURT:  Okay.  Mr. Singh, the government doesn't

25  oppose it, I'm going to permit you to voluntarily surrender to

                              PROCEEDINGS

1   the institution that is designated.  You've got to keep in

2   touch with your counsel to find out what institution that is.

3   That means you're being released on the same conditions of

4   bail that now exist.  If you fail to appear at the prison on

5   the date that you're ordered to appear, the bail will be

6   forfeited, a warrant would issue for your arrest.  If you are

7   arrested under those circumstances you could be charged with

8   an entirely separate offense referred to colloquially as bail

9   jumping, it's a very easy case to prove.  I told you you had

10  to appear and you didn't, the government wins the case and it

11  has an additional five year penalty.

12          Do you understand that?  So it's very important that

13  you show up at the date and time -- are there suretors on his

14  bond?

15          MS. HARAMATI:  No, your Honor.

16          THE COURT:  What is the bond?

17          MR. GIBALDI:  It's a hundred thousand dollars, your

18  Honor.

19          THE COURT:  And no suretors?

20          MR. GIBALDI:  I don't believe so, your Honor.

21          THE COURT:  All right.  Well --

22          MS. HARAMATI:  Your Honor, I will just say that he's

23  been in full compliance and I will certainly stay in touch

24  with him to make sure he --

25          THE COURT:  Okay.

PROCEEDINGS

1           MS. HARAMATI:  I would just ask, I understand from

2   Mr. Singh that one of his adult children is getting married in

3   India that he would like to participate by zoom before he

4   reports and that is at the end of October, and so if it would

5   be possible to have a surrender date the last week in October.

6           THE COURT:  How many weeks is that?

7           MS. HARAMATI:  Approximately 90 days, your Honor, a

8   little less.

9           THE COURT:  Well, it may take that much time to get

10  a designation in any event.  So when is that --

11          THE COURTROOM DEPUTY:  October 28th would be 12

12  weeks.

13          THE COURT:  So October 28th is the date you're

14  asking for surrender, correct?

15          MS. HARAMATI:  Yes, your Honor.

16          THE COURT:  So I'll make the surrender date to the

17  designated institution on October 28th at 9 a.m.  Okay?

18          Anything else that we need to address?

19          MR. GIBALDI:  No, not from the government, your

20  Honor.  Thank you.

21          MS. HARAMATI:  Nothing, your Honor.  Thank you.

22          THE COURT:  Thank you.

23          (Matter concluded.)

                     *     *     *     *     *

24  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

25  s/ Georgette K. Betts                 September 5, 2022

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*